Filed 3/16/15  P. v. Mejia CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B243500 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA094106) |
| v. | |
| CRYSTAL MEJIA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County.  Rand S. Rubin, Judge.  Affirmed as modified.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant Crystal Mejia.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Gloria Limon.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Barry Barnes.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and Appellant Todd Alcorn.

Karyn H. Bucur, under appointment by the Court of Appeal, for Defendant and Appellant Victor Durden.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * * * * * *

Defendants and appellants Crystal Mejia, Gloria Limon, Barry Barnes, Todd Alcorn and Victor Durden were charged with conspiring to murder and rob Pamela Brown, along with several related felonies. All five defendants were found guilty by jury of two or more felonies. In this consolidated appeal, defendants raise numerous contentions challenging the validity of their convictions, including a lack of substantial evidence in support of the verdicts, instructional errors, evidentiary error in the admission of pretrial statements, and sentencing errors. Respondent contends the judgments of conviction are properly affirmed as to all five defendants, but concedes Penal Code section 654[1] sentencing errors with respect to the sentences of Mejia, Limon and Alcorn.

We conclude there were section 654 sentencing errors as to the sentences of all five defendants and we modify the sentences accordingly. We affirm the judgments as modified.

### FACTUAL AND PROCEDURAL BACKGROUND

**1. The Events of April 22 and 23, 2011**

The victim, Pamela Brown, testified that in April 2011, she was living at the American Inn motel in Pomona. Her room was on the second floor. A balcony or exterior walkway ran the length of the second floor and provided access to the individual rooms.

On April 22, 2011, defendants Alcorn, Mejia and Limon were with Brown in her room at the motel, "doing tattoos." Brown had just met Limon (also known as "Sad Girl") that day. Brown had known Mejia (also known as "Baby") for awhile, and had been acquainted with Alcorn (also known as "Raider") for a few weeks. Two other

---

[1] All further undesignated section references are to the Penal Code.

2

people were also there, a white male with a lot of tattoos who was a friend of Alcorn's, and a male Hispanic with a scar on his face.

At some point during the day, Alcorn, Mejia and Limon were outside on the front balcony when an incident occurred. Brown was not sure what happened, but right after, someone on the balcony tried to get into her room, and she refused to open the door. She then heard the sound of Alcorn's truck, which had a very loud engine, driving away. Shortly thereafter, the police arrived at the motel.

Around midnight, Brown received a phone call from Alcorn. Alcorn told Brown he had let someone borrow his truck and asked her to come pick him up on San Dimas Avenue. She agreed, but got lost on her way there. After several cell phone conversations, Alcorn was able to direct her to the intersection where he was waiting.

Brown drove a blue Chevy Impala. When Alcorn got into the car, he told her he needed to pick up a few things from a friend's house. With directions from Alcorn, she drove to the house, a one-bedroom home in San Dimas rented by defendant Barnes. The house was set back down a driveway that ran alongside the larger main house at the front of the property. Alcorn had been staying there for a few days, without the permission of Barnes's landlord, claiming to be Barnes's brother.

When Brown pulled up to the house, Barnes was standing outside next to his car. Brown had never met Barnes. She noticed he wore leg braces. Barnes and Alcorn asked Brown to come inside.

Brown told Alcorn to get his things and she would wait for him in her car. She had food in the car and wanted to eat it. Barnes and Alcorn urged her to come in. Brown relented and followed Barnes into the house, with Alcorn behind her. When she reached the open front door, she saw Mejia and Limon inside, sitting on a couch in the living room. They both had knives on their laps. Limon's knife was "long," and Mejia's knife had ridges on it, like a hunting knife. Brown saw another male she did not recognize standing next to Barnes, who had walked from the front door into the kitchen. At that point, Alcorn pushed Brown through the door, into the living room, and closed the door behind him.

3

Mejia said she heard Brown had been talking about her, and she was going to kill Brown.  Brown denied saying anything about Mejia.  Brown could tell something bad was going to happen, so she "jumped" toward the couch and all three women began to fight.  Limon stabbed Brown in the head and the eye.  Brown fell to the ground and screamed for help.  She continued to fight with Mejia and Limon.  At one point, Mejia grabbed at Brown's hands and wrested her car keys from her.

Barnes was standing near where Brown was being pinned on the floor.  Brown saw Barnes had a knife as well.  It may have been a kitchen knife.  He said "[s]hut up, bitch" or he was going to "slice [her] throat," and he put the knife against her throat.  Alcorn told Barnes to hand him some duct tape, and Barnes passed him a roll of gray duct tape.  Alcorn taped her ankles together, taped her hands at the wrists behind her back, and put tape around her nose and mouth.

Brown may have briefly passed out.  At some point, Brown noticed the front door was slightly ajar and she was alone in the room.  She was able to break loose from the tape.  She stood up and started for the front door, hoping to close and lock it.  An African-American male who Brown did not know (later identified as defendant Durden) yelled, "She got free."  He had been standing just outside the front door.  Durden stepped inside, grabbed a baseball bat near the door and hit Brown on the head about five times.  Brown fell to the floor and "faked" being dead.

Alcorn and Limon came back inside the house.  Limon said to Alcorn, "Let me take her rings."  Limon took several rings from Brown's fingers.

Brown tried to hold her breath and continued to pretend she was dead.  Alcorn bound her up again with more duct tape.  Tape was placed around her mouth, her ankles and her wrists, but this time her wrists were bound in front of her body.  She heard Alcorn speaking with another male, who sounded African-American.  Alcorn asked for help carrying Brown to his truck and driving to the mountains, possibly to "dump" her at Mount Baldy.  Brown kept her eyes shut, pretending to be dead.  She felt herself being carried by two people, put into the bed of Alcorn's truck, and covered with a blanket.

The truck started to move.  Brown removed some of the tape from her face and mouth.  She then used her teeth to tear through the tape around her wrists and removed

4

the tape from her ankles. After a short distance, the truck came to a stop at a gas station. Brown opened the latch on the bed of the truck and rolled out of the truck as it "sped off." Brown ran up to the convenience store of the gas station and tried to get in. The door was locked and she yelled for the employee inside to let her in, but he would not open the door.

The employee inside the gas station was Ruben Morales. He testified he was working his regular shift at the Mobil gas station on Foothill Boulevard in La Verne. Around 1:30 in the morning, he heard tires "screeching" and saw a truck "peeling out" of the station. Almost immediately, a woman appeared at the door and started pounding on the glass, leaving blood all over the glass. She looked hysterical and was yelling to be let in because someone was going to come back and kill her. She had duct tape around her head and face and there was blood "everywhere." He immediately called 911, but did not open the door.

Within minutes, Jason Barrios, a patrol officer with the La Verne Police Department, reported to the gas station. When he arrived, Officer Barrios saw a white female "huddled" next to the entrance doors. She had blood on her clothes, face and hands, and appeared to be in shock. The woman identified herself as Pamela Brown. She appeared to have some swelling to her forehead, and there was duct tape still stuck around her head, jaw, and lower legs.

Danielle Damian, a deputy with the Los Angeles County Sheriff's Department, arrived soon thereafter. She spoke with Officer Barrios and saw that Brown had been placed in an ambulance and was being treated by paramedics of the La Verne Fire Department. Brown appeared to be "disoriented," had blood all over her face and hands, and her eyes appeared swollen shut. Deputy Damian spoke briefly to Brown, who said "they left in a truck." At that point, the paramedics told Deputy Damian they needed to transport Brown to the hospital.

Brown was taken to Pomona Valley Hospital. Registered nurse Jan Hare examined her upon arrival. She also took photographs to document her injuries. Brown had lacerations to her finger, eye and left thigh that required sutures. She also had numerous contusions and abrasions on her wrists, hands, arms, neck and face. The eye

5

with the laceration was swollen shut with extensive bruising around the eye socket. The lacerations to her leg and eye were consistent with knife wounds. Another laceration and swelling to her forehead was more consistent with blunt force trauma.

Deputy Damian spoke again with Brown in the emergency room at the hospital. Brown described the five individuals who attacked her. She said three of them were people she knew as Raider, Crystal and Sad Girl. The other two she did not know. One was a white male with long brown hair and leg braces, and the other a black male in his 30's.

Brown told Deputy Damian how she had driven to Barnes's home at Alcorn's request, and had been attacked there. She recounted that during the attack, Barnes kneeled next to her and put a knife to her throat. A male voice said, "Shut up, bitch. No one's going to help you." She told Deputy Damian she was twice bound with duct tape, beaten and stabbed. She said she played dead and recalled hearing a male voice saying that she was "gone," that they had to get rid of the body, and that they should "dump her body at [Mount] Baldy." Brown recounted being carried to and put in the back of Alcorn's truck. She described how she was able to break free and escape from the truck. Brown told Deputy Damian they tried to kill her because of an incident that had occurred earlier at the American Inn in Pomona. Brown did not tell Deputy Damian that Mejia and Limon had knives, or that her rings or car keys had been taken from her.

Rudolf Schaap, a 28-year veteran of the Los Angeles Sheriff's Department, was assigned as the lead detective to investigate Brown's assault. He interviewed Brown at the hospital several times, and also recorded an interview with her following her release from the hospital.

Based on information provided by Brown, several agents of the United States Marshal's Fugitive Task Force located and arrested Mejia, Alcorn, Barnes and Durden. Mejia was found in possession of Brown's Impala, her registration and disabled driving placard. A photograph on Mejia's cell phone showed a picture taken from inside Barnes's residence. A knife was also found in her purse. Alcorn and his truck were located in Upland. Evidence collected from his truck included a bag of rings, a cell

6

phone, and paperwork bearing Alcorn's name that had bloodstains on it.**2** Barnes was arrested in Pomona and taken into custody along with a backpack containing a knife. Durden was arrested in Apple Valley. Evidence collected at Barnes's residence included multiple blood samples and a kitchen knife on top of the television stand in the living room.

Detective Andrew Bebon, of the Pomona Police Department, located and arrested Limon in Pomona. Detective Bebon investigated the incident that took place on April 22 at the American Inn motel. Detective Bebon was acquainted with Brown because he was also investigating the murder of Brown's boyfriend which had occurred about a month earlier. While in the hospital, Brown asked to speak with Detective Bebon, and he spoke to her briefly about what happened.

## 2. The Charges

Defendants were charged by amended information as follows. All five defendants were charged with one count of conspiracy to commit robbery and murder (Pen. Code, § 182, subd. (a)(1); count 1); one count of attempted first degree murder (§ 187, subd. (a), § 664; count 2); one count of robbery in concert (§ 211; count 3); and one count of kidnapping to commit robbery (§ 209, subd. (b)(1); count 5). Defendants Mejia and Limon were also jointly charged with one count of unlawful taking or driving of a vehicle (Veh. Code, § 10851, subd. (a); count 4).

It was specially alleged that as to counts 1, 2, 3 and 5, defendants Mejia, Limon, Barnes and Durden personally used a deadly or dangerous weapon in the commission of the offenses (§ 12022, subd. (b)(1)), and that all defendants personally inflicted great bodily injury (§ 12022.7, subd. (a)). It was further alleged Mejia had suffered one prior strike conviction for a serious felony and four prior prison terms; Limon had suffered three prior prison terms; and Durden had suffered five prior strike convictions for serious

---

**2**    The rings were later shown to Brown by Detective Schaap and Brown identified one of the rings as having been taken from her by defendants.

7

felonies and eight prior prison terms. (§ 667, subds. (a)-(i), § 1170.12, subds. (a)-(d), § 667.5, subd. (b).)

Defendants pled not guilty to all counts and denied the special allegations. The prosecution's motion for a dual trial with a separate jury for defendant Durden was granted. Durden's jury was denominated "jury A" or the "blue jury," and the jury for Mejia, Limon, Barnes and Alcorn was "jury B" or the "red jury." The prosecution's motion to exclude pages 15 through 21 of Durden's recorded pretrial statement to police was granted, over Durden's counsel's objection and his request for the full statement to be admitted. The defense motions to bifurcate trial of the priors were also granted.

3.      **The Prosecution Evidence**

In addition to the testimony described above, Brown admitted she had suffered prior misdemeanor convictions for prostitution and prior felony convictions for drug possession for sale, making criminal threats and burglary. She also conceded she owned a gun for protection, which she purchased after her boyfriend was murdered. She kept it concealed in her car. Brown admitted that in April 2011 she was regularly selling drugs and that, on the day of the incident, she and Alcorn possessed methamphetamine.

During cross-examination of Brown, several inconsistencies between Brown's pretrial statements and trial testimony were disclosed, including: (1) she was unsure whether Barnes was standing outside his house when she drove up, or if he came out and stood by the car after she stopped and parked, but she did not recall telling a police officer she first saw Barnes inside the house; (2) she was not sure if Barnes was standing, kneeling or in another position when he verbally threatened her, but she was sure he put a knife to her throat; (3) she admitted she never told the detectives she "jumped" on Mejia first after being pushed into the house; (4) and she denied telling Detective Schaap she thought defendants panicked when they thought they had killed her.

Detective Schaap testified to the evidence recovered during the investigation and his numerous discussions with Brown. He conceded there were some inconsistent aspects to Brown's version of events. For instance, during his initial interview of her in the hospital, Brown did not say Barnes held a knife to her throat when he threatened her, she did not describe being stabbed in the eye, she did not report she "attacked" Mejia and

8

Limon first after being pushed into the house, she was inconsistent as to who taped her up and who "beat" her, and she did not report any rings having been stolen from her. Detective Schaap testified he believed Brown answered the questions to the best of her ability "at that time." He explained Brown's doctor told him she was sedated and asked him to interview her later, but that with the suspects still "outstanding," he felt it was "imperative" to speak with her then.

Detective Schaap testified that during the later taped interview of Brown at the station in May 2011, she recounted the material aspects of the incident which were largely consistent with her prior statements to law enforcement. She described the earlier incident at the American Inn motel, Alcorn calling her around midnight to come pick him up, Alcorn directing her to Barnes's house, Barnes waiting outside when she pulled up with Alcorn, Barnes going inside first and then Alcorn pushing her inside the door, Mejia and Limon waiting inside on the couch with knives, Mejia's threat that she was going to kill Brown for talking, being stabbed several times, her car keys being taken from her, Alcorn asking Barnes for duct tape and being taped up twice, Durden yelling "she got free" after she broke loose of the duct tape, Durden hitting her with a bat, and being carried to the back of Alcorn's truck. During the taped interview, Brown told Detective Schaap she felt the defendants seemed "to panic" when they thought she was dead.

The recording of the 911 call from the gas station where Brown escaped was played for the jury, as was the surveillance video from the gas station showing Brown falling from the back of Alcorn's truck before it sped away. The surveillance video from the American Inn motel was also played for the jury which showed, in part, three people descending from the second-floor balcony area and driving out of the motel parking lot in Alcorn's truck.

DNA evidence was admitted demonstrating that several of the blood samples collected from Barnes's home and on the rear handle pull of Alcorn's truck were consistent with Brown's DNA profile. A blood sample from the bathroom faucet in Barnes's home also showed a combined sample consistent with both Brown and Limon. And, another sample obtained in the living room was consistent with Brown and Barnes as a possible minor contributor.

9

Cell phone records were admitted that showed Brown received two calls from Alcorn around midnight on the day of the incident.

Durden's redacted pretrial statement to law enforcement was presented to his jury only. Durden said he received a call from Alcorn on April 22, 2011. Alcorn said he needed to talk to him, so Durden drove down to San Dimas from Apple Valley, picked up Alcorn at a gas station and then followed Alcorn's directions to Barnes's house. When they arrived, there were two females and two males he did not know in the house along with a "handicapped guy." The girls did not look "friendly" and had "long knives." For most of the day, they sat around smoking methamphetamine. Alcorn left for a while, and when he returned, he had another female with him who Durden did not know.

Durden wanted to use the bathroom so he went into the bedroom where the other two males were doing something with a printer. He heard a scream from the living room. Durden and the two guys in the bedroom jumped out the bedroom window. When they came around the front of the house, Alcorn was outside and yelled at them to wait there. Durden heard a female voice say "shut this bitch up." The screaming stopped when Alcorn went back into the house. The two girls with knives came out of the house and left in a car with one of the guys who had jumped out the window. Durden did not know where the "handicapped guy" had gone.

Alcorn acted aggressively with him and told him he needed his help. Inside the house, the girl who arrived late with Alcorn was on the floor bound with duct tape and bleeding. Durden did not know what happened but Alcorn demanded his help, and he was afraid Alcorn would do something bad to him if he did not help. Durden helped Alcorn pick up the girl and put her in the back of Alcorn's truck. Before leaving the house, Durden took a black cane with an eightball handle that had been in the living room. He and Alcorn got into Alcorn's truck. Alcorn said he had to get gas. When they pulled into the gas station, Durden heard a loud noise. He did not see Brown fall out of the truck, but Alcorn said "she's out," then sped out of the station. Alcorn drove Durden back to his car and he left. Durden sold the black cane to buy drugs.

4. **The Defense Case**

Defendants Barnes, Limon and Alcorn testified during the defense case.

10

Barnes said he had been living at the house in San Dimas for about a year before the incident.  Barnes lived alone, but had been allowing Alcorn to stay at his home for a couple of weeks before the incident.  Barnes did not know and had never met Mejia, Limon, Durden or Brown until that day.  Barnes also said he was not at the American Inn motel at any time on April 22 or April 23, 2011.

Barnes explained he has suffered, since birth, with a condition similar to arthritis that affects his muscles and joints.  He can only walk with the assistance of braces that run the length of both legs, from his hips to his feet.  His knees do not bend well and he is not able to kneel down.  At trial, Barnes used the assistance of a wheelchair.

On April 22, at around 8:00 a.m., Alcorn came over to Barnes's house with Mejia and Limon.  Alcorn introduced the women to Barnes and they sat around in his house for several hours talking and smoking methamphetamine.  Barnes said that since Alcorn had been staying with him, he had been smoking a lot of methamphetamine with Alcorn.  Sometime during the day, Barnes felt extremely tired so he went into his bedroom to try to sleep for a bit, leaving Alcorn, Mejia and Limon in his living room.

Sometime in the early evening he woke up because people had been coming in and out of his room to get to the bathroom.  He realized there were other people at his house, including a Hispanic male with a scar on his face, a white male with tattoos all over his arms, and a black male he later learned was Durden.  Barnes went back to bed for awhile, and then woke up again around midnight.

Barnes said that at that point, Durden and the male with the scar were carrying a small table into his room, and he could see the lights were out in his living room.  He got up to see what was going on.  Barnes saw the front door was open and a woman, he later learned to be Brown, was standing at the threshold.  Mejia and Limon were sitting on the couch and Alcorn was standing outside behind Brown.  Mejia and Limon got up and approached Brown.  Mejia said to Brown, "I heard you been talking, bitch."  At that point, Brown "lunged" at Mejia and Limon and all three women began to struggle, and fell to the ground.  Limon grabbed Brown's legs.  Mejia told Barnes to hand her some tape.

11

Barnes saw a roll of duct tape on his kitchen counter and three strips of tape, already cut, stuck to the counter. Barnes was "very confused." Barnes tried to hand the cut strips to Mejia, but they got twisted up. Mejia got mad and demanded the roll. Limon grabbed the roll of tape and started to help Mejia tape up Brown. Barnes yelled at them to get out of his house.

Barnes saw Durden, the male with the scar, and the male with the tattoos climb out of his bedroom window. At that point, Limon stabbed Brown in the back of her leg and Brown screamed. Barnes went outside to find Alcorn and ask him what was going on. Alcorn told him to go back inside, "shut up and sit the [f---] down." Barnes was scared, but went back inside. He heard Mejia and Limon demanding that Brown give them her car keys.[3] Sometime thereafter, Barnes went back outside and got into his car. Before he drove off, he saw Mejia, Limon and the white male with the tattoos get into a blue Impala. Alcorn was talking to them, but Barnes did not hear what was said. The blue Impala then drove off. As Barnes started to drive away, he saw Durden walking back toward the house.

Barnes drove to a nearby gas station and waited there a couple of hours. He went back to his house for a few minutes to grab a backpack and some money. He did not want to be there in case any of the others came back. He found a bloody shirt on the floor, so he called Alcorn. Alcorn told him to throw the shirt away. Barnes threw the shirt into a dumpster behind a nearby apartment complex. He drove to a 7-Eleven to buy some coffee where he saw a guy he knew and asked for a ride to the bus station. Barnes's car had transmission problems and he did not believe it would get him to the station. The guy agreed to give him a ride. Barnes took a bus to Victorville and hung around there for about a week, and then went to his father's home in Pomona. After a few days, he called the San Dimas sheriff's station and asked whether they were looking for him. He was arrested the next day at his father's home.

---

**3**     On cross-examination, Barnes conceded he told Detective Schaap that Alcorn had given the car keys to Mejia and Limon.

Barnes denied kneeling down next to Brown and holding a knife to her throat. He said he is physically unable to kneel. He admitted that at the point Limon stabbed Brown and she was screaming, he did yell at Brown to "shut the [f---] up." Barnes said he was scared and just wanted her to be quiet. He did not want the neighbors to call the police. Barnes denied knowing anything about what was going on or what had been planned. He did not know Brown and denied bearing her any ill will. He said he had no intent to rob her, hurt her or murder her. He denied attacking her in any way. He said he did not try to call the police while the others were attacking Brown because he was afraid they would attack him too. He said that before the incident, Mejia had been "petting" her knife like it was something she "adored," and "bragging" about a stabbing that had occurred earlier that day. Barnes said the knife in his backpack was a fishing knife. He understood one of his kitchen knives was found on top of his television and he believed it must have been placed there when they had all been eating in the living room earlier in the day. Barnes conceded he had a baseball bat in his front room that belonged to his nephew.

Limon testified that on April 22, 2011, she was with Mejia at the American Inn motel. Brown and Alcorn were also there, as was Limon's ex-boyfriend, and another white male giving people tattoos. She had been friends with Mejia for a long time, but did not know Brown or Alcorn. Everyone was getting high. After a few hours, Limon left with Mejia and Alcorn in Alcorn's truck. They drove to Barnes's house and continued to party there. Limon did not know Barnes and only met him that day.

Limon fell asleep for awhile and woke up sometime late at night. She noticed Brown and Alcorn walking in through the front door. When Mejia got up from the couch, Brown grabbed Mejia and started to struggle with her. Brown was swinging her car keys at Mejia. Limon tried to help Mejia by grabbing Brown around the legs, but she was much bigger than Limon. Brown was kicking Limon. Limon had a pocketknife and stabbed Brown in the back of the leg. Limon denied ever seeing anyone put duct tape on Brown.

Limon saw Brown's car keys on the couch, so she grabbed them and told Mejia she wanted to leave. As she and Mejia started to leave the house, Limon saw Alcorn and Barnes standing over Brown. Barnes had a roll of duct tape in his hands. Limon handed

13

the car keys to Mejia and they headed for Brown's car. The guy with the tattoos got into the car with them. As they started to pull away, Limon saw, through the open front door, that Durden had grabbed some sort of bat, or the cane with an eightball handle that had been in the living room, and hit Brown with it several times.

Limon denied there was any plan to attack Brown. Limon said she only stabbed Brown because Brown had attacked her friend, Mejia. Limon denied taking any rings from Brown. She denied having any intent to hurt, kill or kidnap Brown. Limon also denied seeing Mejia with a knife at any time during the day. Limon said she never heard Mejia make any verbal threats to Brown or brag about the incident that happened earlier at the American Inn. She also did not recall Barnes ever telling Brown to "shut the [f---] up." Limon said she had been doing a lot of methamphetamine and the whole incident upset her. Limon admitted she had previously been convicted of joyriding, burglary and receiving stolen property.

On cross-examination, Limon conceded she never told law enforcement that she had stabbed Brown, that Brown had been swinging her keys at Mejia, or that the three of them had been fighting because she was afraid of getting in trouble. She did not recall telling Detective Schaap she woke up that evening when she heard someone say "Raider's back." She also did not recall telling him that Alcorn was behind Brown as they entered the house, that Brown looked scared and Alcorn told Brown to "keep going." Limon admitted she told Detective Schaap that Brown was screaming for help and Alcorn told her and Mejia to "shut her up," that Barnes appeared in the living room with duct tape, and that Alcorn taped up Brown. Limon also admitted she threw her pocketknife away on the freeway when driving away from the scene.

Alcorn testified he had known Brown for several months before the incident. On April 22, 2011, he was at Brown's room at the American Inn motel, getting high with Brown and several other people who were there. He met Mejia and Limon that day in Brown's room. At some point, he and Brown left and picked up his friend, Sean, who had lots of tattoos on his arms, and they began to do tattoos in Brown's room. An altercation occurred at the motel, and Alcorn left in his truck with Mejia and Limon.

14

They drove to Barnes's house in San Dimas. Alcorn had methamphetamine with him, so when they arrived at Barnes's house, they all sat around and smoked until the drugs ran out. Sometime during the day, Sean arrived with some of Alcorn's tattooing equipment. Durden, another friend of Alcorn's, also came over. A Hispanic male with a scar on his face who had been at the motel came over as well. Twice during the day, Alcorn and Barnes contacted a dealer to obtain more methamphetamine to continue "partying."

Alcorn saw Mejia had two knives with her. One was a pocket knife, and the other was "diamond-shaped," and Mejia was "petting it." Alcorn said it was very "weird." Limon had a pocket knife clipped to her shorts.

Alcorn spoke on the phone a few times during the day with Brown, and then again around midnight, when Brown called him asking if he had any drugs and whether she could come over and get high with them. He said she should come over and gave her directions to Barnes's house. Alcorn denied asking Brown to come pick him up. Brown got lost and after several more calls trying to clarify the location, Alcorn walked to an intersection Brown was familiar with and she picked him up there.

Alcorn said no one was outside when he and Brown pulled up to Barnes's house. Brown and Alcorn sat in the car a few minutes and talked while they ate a sandwich Brown had bought on the way over. Alcorn walked Brown up to the front door and let her in. He denied pushing her through the door. Alcorn said he then went down the street to meet his dealer to buy some more drugs. As he approached Barnes's house after buying the drugs, he saw Durden, Sean and the guy with the scar jumping out of Barnes's window. They yelled to Alcorn "they're beating her up." When he asked what they were talking about, they told him that Mejia and Limon were beating up Brown.

Barnes then came out of the house. Alcorn said Barnes looked scared and angry about the fighting going on in his house. Alcorn told Barnes to "shut the [f---] up" because he was worried about neighbors overhearing and calling the police, and they had a lot of drugs on them and could get in trouble.

He and Barnes went back inside the house. Alcorn saw Brown lying on the floor. She had duct tape on her, but some of it was already torn off. Brown may have been

unconscious, as she was not moving. Alcorn denied hitting her, taping her up, or taking any rings or car keys from her. Alcorn said he did see Brown's car keys on the couch, but when he picked them up, Mejia "snatched" them out of his hands. He explained the rings found in his truck did not belong to Brown, but were rings people had given him from time to time in exchange for drugs.

Alcorn pled with Mejia and Limon not to take Brown's car, but they took it anyway. As they pulled away, Mejia yelled back to Alcorn, "[d]on't worry, I'll send my people back to get her."

Alcorn was concerned about what Mejia meant. He told Durden they needed to get out of there. They got into Alcorn's truck and started to drive away, but he told Durden they had to go back and take Brown to the hospital. When they returned to Barnes's house, Brown was still lying on the floor. Alcorn tried to pick her up but was unable to do so. He told Durden to help him and they carried her to his truck and put her in the bed of the truck. He closed the cover over the bed. Alcorn explained he could not put Brown in the back seat of the truck because he had all of his possessions stored in there, since he was "between" residences. Alcorn started to drive in the direction of Pomona Valley Hospital.

While he was driving along Foothill Boulevard, he saw in his rear view mirror that the bed cover was moving up and down. Alcorn immediately pulled over at a gas station. Before he could stop the truck, Brown rolled or fell out of the back of the truck. Through his mirror, he saw her stand up and look at him. Alcorn "freaked out and drove off." Alcorn drove Durden back to pick up his car, then drove to another friend's house to stay. He did not return to Barnes's house.

Alcorn denied having any desire to hurt or kill Brown and denied there was any agreement to do so. He denied calling Brown to "lure" her to Barnes's house and said he never talked about dumping her body at Mount Baldy. Alcorn also denied ever putting any duct tape on Brown. He admitted he told Barnes to throw away the bloody shirt Barnes found in his house. On cross-examination, Alcorn admitted he had a prior felony conviction for fraud and a prior misdemeanor conviction for theft.

16

## 5.     The Verdicts and Sentencing

As to Mejia and Limon, the jury found them each guilty of conspiracy to commit murder and robbery (count 1), first degree robbery (count 3), unlawful driving or taking of a vehicle (count 4), and kidnapping to commit robbery (count 5). The jury found, as to counts 1, 3 and 5, Mejia and Limon each used a deadly weapon and inflicted great bodily injury in the commission of the offenses. The jury acquitted Mejia and Limon of attempted murder (count 2).

As to Barnes, the jury found him guilty of conspiracy to commit murder and robbery (count 1), first degree robbery (count 3), and the lesser included count of simple kidnapping (count 5). The jury acquitted Barnes of attempted murder (count 2), and, found not true the personal use allegations and infliction of great bodily injury allegations as to all counts.

As to Alcorn, the jury found him guilty of conspiracy to commit murder and robbery (count 1), attempted first degree murder (count 2), first degree robbery (count 3), and the lesser included count of simple kidnapping (count 5). The jury found, as to counts 1, 2 and 5, Alcorn inflicted great bodily injury in the commission of the offenses. The jury found not true the bodily injury enhancement as to count 3.

Durden's jury found him guilty of conspiracy to commit robbery (count 1), first degree robbery (count 3), and kidnapping to commit robbery (count 5). The jury found, as to counts 1, 3 and 5, Durden used a deadly weapon and inflicted great bodily injury in the commission of the offenses. The jury was unable to reach a verdict on attempted murder (count 2). The court declared a mistrial as to count 2, and subsequently granted the prosecution's motion to dismiss that count.

The court imposed the following sentences.

Defendant Mejia admitted her prior felony strike and the four prison term priors, including a prior conviction for unlawful taking of a vehicle. The court struck, pursuant to section 1385, Mejia's one-year prison term priors. Mejia was sentenced as a second-strike offender to a state prison term as follows. As to count 1 (conspiracy to commit murder and robbery), 25 years to life (§ 182), doubled due to the strike, plus five years (§ 667, subd. (a)), plus three years for the great bodily injury enhancement (§ 12022.7,

17

subd. (a)), and one year for the personal use enhancement (§ 12022, subd. (b)(1)). Also as to count 1, the court imposed, and stayed pursuant to section 654, an upper term of six years, doubled due to the strike, for conspiracy to commit robbery. As to count 3 (first degree robbery), a consecutive upper term of nine years, doubled due to the strike, plus five years (§ 667, subd. (a)), three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and one year for the personal use enhancement (§ 12022, subd. (b)(1)). As to count 4 (unlawful taking of vehicle), an upper term of four years (§ 666.5), doubled due to the strike. The sentence on count 4 was stayed pursuant to section 654. As to count 5 (kidnapping to commit robbery), a consecutive life term with a seven-year minimum parole eligibility (§ 209), doubled due to the strike, plus five years (§ 667, subd. (a)), three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and one year for the personal use enhancement (§ 12022, subd. (b)(1)). The court awarded Mejia 552 days of custody credits, and imposed statutory fines and fees.

Defendant Limon admitted her three 1-year prison term priors (§ 667.5), which were subsequently struck by the court pursuant to section 1385. Limon also admitted one of her prior convictions was for unlawful taking of a vehicle (§ 666.5). The court imposed a state prison term calculated as follows. As to count 1 (conspiracy to commit murder and robbery), 25 years to life (§ 182), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and one year for the personal use enhancement (§ 12022, subd. (b)(1)). Also as to count 1, the court imposed, and stayed pursuant to section 654, an upper term of six years, for conspiracy to commit robbery. As to count 3 (first degree robbery), a consecutive upper term of nine years, plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and one year for the personal use enhancement (§ 12022, subd. (b)(1)). As to count 4 (unlawful taking of vehicle), an upper term of four years (§ 666.5), stayed pursuant to section 654. As to count 5 (kidnapping to commit robbery), a consecutive life term with a seven-year minimum parole eligibility (§ 209), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and one year for the personal use enhancement (§ 12022, subd. (b)(1)). The court awarded Limon 552 days of custody credits, and imposed statutory fines and fees.

Defendant Barnes was sentenced to a state prison term calculated as follows. As to count 1 (conspiracy to commit murder and robbery), 25 years to life (§ 182). Also as to count 1, the court imposed, and stayed pursuant to section 654, a midterm of four years, for conspiracy to commit robbery. As to count 3 (first degree robbery), a consecutive midterm of six years. And, as to count 5 (simple kidnapping), a consecutive term of one year eight months (one-third the midterm). The court awarded Barnes 552 days of custody credits and imposed statutory fines and fees.

Defendant Alcorn was sentenced to a state prison term as follows. As to count 1 (conspiracy to commit murder and robbery), 25 years to life (§ 182), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)). Also as to count 1, the court imposed, and stayed pursuant to section 654, an upper term of six years, for conspiracy to commit robbery. As to count 2 (attempted murder), a consecutive life term with minimum parole eligibility of seven years, plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)). As to count 3 (first degree robbery), a consecutive upper term of nine years. And, as to count 5 (simple kidnapping), a consecutive term of one year eight months (one-third the midterm). The court exercised its discretion to strike the great bodily injury enhancement as to count 5. The court awarded Alcorn 717 days of custody credits, and imposed statutory fines and fees.

In a court trial on defendant Durden's prior strikes, the court found the prior strikes to be true, but concluded two of them occurred in the same case on the same date, and therefore, only four would count for sentencing purposes. The court also denied defendant Durden's *Romero*[4] motion, but struck, pursuant to section 1385, all eight of his one-year prison priors.

Defendant Durden was sentenced as a third-strike offender to a state prison term as follows. As to count 1 (conspiracy to commit robbery), 33 years to life (§ 667, subd. (e)(2)(A)(iii), § 1170.12, subd. (c)(2)(A)(iii)), plus a determinate term of 24 years on the enhancements based on the four 5-year priors, a three-year great bodily injury

---

[4]    *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

enhancement, and a one-year personal use enhancement (§ 667, subd. (a)(1), § 12202, subd. (b)(1), § 12022.7, subd. (a)). As to count 3 (first degree robbery), an identical sentence to count 1 to run concurrently. And, as to count 5 (kidnapping to commit robbery), a consecutive term of 31 years to life (§ 667, subd. (e)(2)(A)(iii), § 1170.12, subd. (c)(2)(A)(iii)), plus a determinate term of 20 years on the enhancements (the three-year and one-year enhancements were stayed pursuant to section 654). The court awarded Durden 563 days of custody credits, and imposed statutory fines and fees.

Defendants filed timely appeals. By order of this court, the appeals of Alcorn (case No. B246339) and Durden (case No. B244422) were consolidated with the appeal of Mejia, Limon and Barnes under docket No. B243500.

## DISCUSSION

### 1. The Substantial Evidence Arguments

Defendants Mejia, Limon, Barnes and Alcorn raise numerous contentions asserting the lack of sufficient evidence supporting their respective convictions. We review the record under the familiar standard. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

### a. Count 1—conspiracy

Defendants Mejia, Limon, Barnes and Alcorn contend the conspiracy count fails for lack of sufficient evidence of an agreement, and of the requisite dual specific intents.

"A conspiracy is an agreement by two or more persons to commit any crime. [Citations.] A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024 (*Vu*); see also § 182.) The elements of conspiracy may be proven with circumstantial evidence. (*Vu,* at pp. 1024-1025; see also *People v. Hardeman* (1966) 244 Cal.App.2d 1, 41 [a conspiracy " 'may be proved by indirect evidence and inferences justified by the circumstances' "].) To prove conspiracy, it is *not necessary* to present

20

evidence the conspirators met and expressly agreed to commit the target offense. (*Vu, supra*, at p. 1025.)

The record contains ample evidence of coordinated action by the five defendants in the attack on Brown—evidence from which the jury reasonably inferred the existence of an agreement to commit the crimes against Brown. Alcorn called Brown around midnight asking her to come get him on false pretenses, specifically that someone had borrowed his truck and he needed a ride. Cell phone records corroborated Brown's testimony that Alcorn called her at that time. The evidence regarding the earlier incident at the motel supported a reasonable inference Alcorn had been involved and fled with Mejia and Limon, and therefore had a motive to seek retribution against Brown, whom the defendants apparently believed had snitched on them to police. Barnes and Durden conceded being friends with Alcorn, providing a basis for their motivation to aid the plan. Barnes corroborated Brown's testimony that Mejia threatened her when she arrived, namely that they heard Brown had been "talking."

Barnes was outside waiting for Alcorn and Brown as if their arrival was expected. Barnes and Alcorn insisted that Brown enter the house. Barnes led the way, with Alcorn behind her. When she stopped at the threshold, Alcorn pushed her inside where the rest of the defendants were waiting, and by Limon's account to police, Alcorn ordered Brown to "keep going" when she hesitated. Mejia and Limon were waiting for them in the front living room, with knives on their laps. Alcorn, Barnes and Durden stood by as Mejia and Limon assaulted Brown with the knives.

Brown also testified to her car keys being wrested from her, and multiple rings being taken from her fingers. Brown testified Barnes told her to shut up, she reported to Deputy Damian that a male voice said "[n]o one's going to help you," and when duct tape was asked for, Barnes had it at the ready. Alcorn bound Brown with duct tape. When Brown got free of the tape, Durden immediately yelled "[s]he got free," re-entered the house, and hit her multiple times in the head with a bat or cane until she fell to the floor. Alcorn and Limon also re-entered the house and Brown was bound with tape once more. A discussion was had about dumping Brown's body at Mount Baldy. Brown was placed, bound around the face, hands and fee, into the bed of Alcorn's pickup truck and

21

covered. Mejia and Limon stole Brown's car. Barnes left in his own car, and Alcorn and Durden drove off with Brown. When she unexpectedly escaped from the back of the truck at a gas station, Alcorn fled, leaving Brown, bleeding from multiple wounds. Upon arrest, Mejia was found still in possession of Brown's stolen car, and Alcorn still had possession of one of her stolen rings.

With this evidence, the jury was justified in finding a conspiracy had been formed. "One who conspires with others to commit a felony is guilty as a principal. (§ 31.) ' "Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." [Citations.]' [Citation.]" (*In re Hardy* (2007) 41 Cal.4th 977, 1025-1026; accord, *People v. Morante* (1999) 20 Cal.4th 403, 417 [" ' " '[T]he act of one [conspirator] is the act of all. Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences . . . .' " ' "].)

To the extent some of the defendants point to their own self-serving testimony that they were only at the location by happenstance and had no idea what was planned, the jury was entitled to reject their testimony. (See, e.g., *People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1735 [jury entitled to reject as unreasonable a defendant's testimony that he was coincidentally at locations where large-scale drug transfers occurred but had no knowledge or involvement in what transpired].)

Moreover, defendants' reliance on the inconsistencies in some aspects of Brown's testimony as compared with her multiple pretrial statements to law enforcement is also unavailing. The jury plainly believed the material portions of Brown's testimony. "The jury is the ultimate judge of credibility. The jury may find a witness is credible in some respects and not in others; it may believe parts of a witness's testimony without believing all of it." (*Vu*, *supra*, 143 Cal.App.4th at p. 1029; see also CALCRIM No. 226 ["You may believe all, part, or none of any witness's testimony"].)

Further, a defendant's conduct *after* the commission of a crime may evidence a "consciousness of guilt." (*Vu*, *supra*, 143 Cal.App.4th at p. 1029.) For instance, evidence of flight immediately following the crime or use of a false alibi are relevant to

22

show consciousness of guilt. (*Id*. at p. 1030.) Mejia and Limon fled the scene in Brown's car and Limon threw the knife she had wielded out the window on the freeway to dispose of it. Barnes fled the scene, which was his own home, and disposed of evidence of bloody clothes after conferring with Alcorn about it. Alcorn and Durden also immediately fled the scene, with Durden taking the eightball cane he had used to hit Brown. The conduct of defendants following the commission of the crimes reflected a consciousness of guilt and further corroborated the existence of the conspiracy and its intended goals.

On the required element of intent, "the crime of conspiracy requires dual specific intents: a specific intent to agree to commit the target offense, and a specific intent to commit that offense." (*People v. Jurado* (2006) 38 Cal.4th 72, 123 (*Jurado*).) The evidence discussed above is solid, credible support for the jury's determination that each defendant evinced the requisite dual intents for the crimes of murder and robbery. That the evidence of their respective intents is premised on circumstantial evidence and inferences does not undermine the verdicts, as there is "rarely" direct evidence of a defendant's intent or mental state. (*Vu*, *supra*, 143 Cal.App.4th at p. 1025.)

Some of the defendants argue that purportedly inconsistent verdicts or findings on enhancement allegations undermine the guilty verdicts on the conspiracy count. But section 954 provides, in relevant part, that "[a]n acquittal of one or more counts shall not be deemed an acquittal of any other count." It is well established "that an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both. [Citations.] When a jury renders inconsistent verdicts, 'it is unclear whose ox has been gored.' [Citation.] The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity . . . .' [Citation.] Because the defendant is given the benefit of the acquittal, 'it is neither irrational nor illogical to require [the defendant] to accept the burden of conviction on the counts on which the jury convicted.' [Citation.]" (*People v. Santamaria* (1994) 8 Cal.4th 903, 911 (*Santamaria*).)

" '[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.' " (*People v. Lewis* (2001) 25 Cal.4th 610, 656, quoting *United States v. Powell* (1984) 469 U.S. 57, 67.)

Defendant Mejia relies on the so-called "conspiracy exception" to the general rule that inconsistent verdicts are allowed to stand, citing *Akhlaghi v. Superior Court* (2008) 161 Cal.App.4th 561. However, even in the context of conspiracy claims, the Supreme Court has "conclude[d] that the rule of consistency is a vestige of the past with no continuing validity." (*People v. Palmer* (2001) 24 Cal.4th 856, 858.) Even if the conspiracy exception were still viable, it would not apply here. The exception has always been construed narrowly, "applying only where . . . an overt act alleged in a conspiracy charge is identical to another charged offense of which [the] defendant is acquitted." (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1658; see also *Jurado*, *supra*, 38 Cal.4th at p. 122 ["An inconsistency between a 'not true' finding on an overt act and a verdict or another finding is not a ground for overturning the inconsistent verdict or finding" and did not undermine the jury's conviction on conspiracy].)

The evidence presented to the jury on the conspiracy charge and the attempted murder charge clearly overlapped, but the prosecution did not rely on identical evidence to prove the two charges. For example, the overt acts alleged and proved to support the conspiracy did not include an allegation that Mejia attempted to kill Brown. The jury's decision to acquit Mejia on the attempted murder charge was not inconsistent with its guilty verdict on the conspiracy charge.

Defendant Limon also argues the evidence does not support her conviction on two separate conspiracies when she was only charged with one conspiracy. Mejia and Alcorn join without additional argument. There is no merit or support in the record for this

24

argument. The defendants were charged with, and convicted of, *one count* of conspiracy, as expressly so designated by both the blue jury and the red jury on the verdict forms.

### b. Count 2—attempted murder

Defendant Alcorn, the only defendant convicted of attempted murder, raises several challenges to the evidence in support of count 2: (1) insufficient evidence of an intent to kill; (2) insufficient evidence of premeditation and deliberation; and (3) insufficient evidence Alcorn acted as a direct perpetrator and took at least one direct, but ineffectual, act to kill Brown.

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, the Supreme Court "identified three types of evidence—evidence of planning activity, preexisting motive, and manner of killing—that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) The court made clear "that ' "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." [Citations.]' [Citation.]" (*People v. Mendoza,* at p. 1069; accord, *People v. Perez* (1992) 2 Cal.4th 1117, 1125, and *People v. Manriquez* (2005) 37 Cal.4th 547, 577 [" '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse' "].)

The facts recited above constitute substantial evidence on which the jury was justified in finding that Alcorn acted with a premeditated and deliberate intent to kill Brown. Additionally, despite Alcorn's argument to the contrary, that same evidence constitutes substantial evidence Alcorn took a direct, but ineffectual step, toward commission of the offense. (See, e.g., *People v. Morales* (1992) 5 Cal.App.4th 917, 926-927 [where scheme is demonstrated, even "slight acts done in furtherance of the crime will constitute an attempt"; there need not be evidence of conduct constituting the "last possible step prior to the commission of the crime"].) There were far more than "slight acts" committed here. The only reason the murder was not completed was due to Brown escaping from Alcorn's truck in a public place. The evidence supports Alcorn's conviction as a direct perpetrator. We need not discuss Alcorn's contention his

25

conviction cannot stand on an aiding and abetting theory because all of the codefendants were acquitted on count 2.

### c. Count 3—robbery

Defendant Barnes contends there is no evidence he was the direct perpetrator of the robbery, and that the evidence supporting a theory of his guilt as an aider and abettor is insufficient. Defendants Mejia and Limon raise joinders without additional argument.

Barnes is correct there was no direct evidence he physically took any property from Brown. However, the record contains solid evidence of Barnes's liability as an aider and abettor of his codefendants. Relying on his own testimony that he had no idea what was planned and had no reason to attack Brown, Barnes argues he was an innocent bystander, caught entirely off-guard by the events that unfolded inside his home. Barnes relies in large part on *People v. Stankewitz* (1990) 51 Cal.3d 72 (*Stankewitz*) for the proposition that mere presence at the scene of a crime or failure to prevent its commission is insufficient to support aiding and abetting liability.

*Stankewitz* is of no assistance to Barnes in light of the evidence he was a participant in the conspiracy. Barnes allowed his home to be used for the coordinated assault of Brown; he was waiting outside for Alcorn to arrive with Brown and led them into his house; he was standing by with duct tape at the ready when it was needed to bind Brown; and, by his own admission, he verbally threatened Brown to "shut the [f---] up" when she was being attacked and screaming for help. Brown testified Barnes threatened her with what she believed was a kitchen knife, and a kitchen knife was found on the television set in Barnes's living room where the attack took place. Moreover, Barnes assisted in trying to cover up the crimes by dumping the bloody shirt left in his house in a dumpster several blocks away, and he fled the scene, abandoning his own home, staying first in Victorville and then going to his father's home in Pomona where he was ultimately arrested.

In sum, the record demonstrates Barnes was active in the overall course of conduct from the very beginning. He was in the living room during the assault, and he was present when Brown's car keys were wrested from her in order to steal her car. Such evidence is more than sufficient to support Barnes's conviction under an aiding and

abetting theory. (See, e.g., *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 743 ["The 'act' required for aiding and abetting liability need not be a substantial factor in the offense. ' "Liability attaches to anyone 'concerned,' however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal." ' "]; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 531-532 [perpetrator need not expressly communicate criminal purpose that is apparent from the circumstances as "[a]iding and abetting may be committed 'on the spur of the moment,' . . . as instantaneously as the criminal act itself"].)

The jury was entitled to discredit Barnes's claims of innocence and, for the reasons already explained above, the jury's not true finding on the personal use of a deadly weapon allegation in Barnes's favor does not undermine the jury's decision to find Barnes guilty of robbery. (§ 954; *Santamaria*, *supra*, 8 Cal.4th at p. 918.)

As for the joinders of Mejia and Limon, there was overwhelming evidence to support their respective convictions for robbery as principals based on their taking of Brown's keys and rings, and then driving away together in her car. Mejia was arrested still in possession of Brown's car. No further discussion of their joinders is warranted.

### d. Count 5—kidnapping

Defendant Limon contends there is insufficient evidence supporting the kidnapping for robbery count because the evidence showed the robbery was complete before there was any asportation of Brown. Mejia joins without additional argument.

It is well settled that "the crime of robbery is not complete until the robber has won his way to a place of temporary safety." (*People v. Carroll* (1970) 1 Cal.3d 581, 585). Brown's rings and car keys had been forcefully taken from her before Mejia and Limon got into Brown's car to flee the scene. At that point, no defendant had reached a place of temporary safety. Brown remained bound and under defendants' control. The robbery therefore was ongoing when the asportation of Brown, by Alcorn and Durden, began around the time Mejia and Limon drove off in Brown's car.

Defendants Alcorn and Barnes, who were convicted on the lesser included count of simple kidnapping, also argue the record does not support their respective convictions. Their arguments are also without merit.

27

Alcorn argues the jury accepted Brown's version of the incident, and since she testified she faked being dead and heard the defendants discussing dumping her body, the defendants must have believed she was dead. Alcorn posits that he could not have intended to kidnap a dead body. The argument does not merit a lengthy discussion. Alcorn in his own self-serving testimony made many statements to the effect he believed Brown was alive when he drove off with her in the back of his truck. Brown is the only witness who testified she heard the defendants talk about disposing of her body. None of the conspirators testified they thought she was dead. The reasonable inference is they intended to kill her later and dispose of her body at Mount Baldy. The evidence is uncontradicted Brown was transported alive, bound and against her will, in the back of Alcorn's pickup truck. That evidence, along with the balance of the record, was more than sufficient for the jury to find Alcorn harbored the requisite intent for kidnapping.

As for Barnes's argument there was no evidence on which he could be convicted of kidnapping because he had already fled the scene when the asportation began, the record belies such a contention. An aider and abettor may be liable for any crimes that were the natural and probable consequence of the target crimes in which he or she knowingly assisted. (See *People v. Nguyen*, *supra,* 21 Cal.App.4th at pp. 529-532.) The prosecutor argued the natural and probable consequences doctrine and the jury was appropriately instructed with CALCRIM No. 402. The evidence discussed above in support of the conspiracy count is ample support for the jury's determination that the kidnapping of Brown was a natural and probable consequence of the attempted murder and robbery of Brown inside Barnes's home, as it was not reasonably likely the defendants had planned to leave Brown's body to be discovered in Barnes's home.

2. **The Jury Instructions**

All five defendants raise claims of instructional error. We review a claim of instructional error de novo. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.)

a. **Instructions on voluntary intoxication**

Defendants Mejia and Alcorn argue the instructions on voluntary intoxication were prejudicially misleading and incomplete. Respondent contends any objection to the

voluntary intoxication instruction was forfeited by the failure to object or seek a modification of the instruction in the trial court.

Defendants' argument, in essence, is that the court failed to give an adequate pinpoint instruction on voluntary intoxication and how it related to the specific intent crimes.  In *People v. Saille* (1991) 54 Cal.3d 1103, 1119-1120, the Supreme Court held "that evidence 'proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt' *may, but only upon request*, justify the giving of a pinpoint instruction that 'does not involve a "general principle of law" as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court.' [Citation.]  'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi.  [Citation.]  They are required to be given *upon request when there is evidence supportive of the theory*, but they are not required to be given sua sponte.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 674-675, italics added.)

Defendant Limon requested CALCRIM No. 3426 on voluntary intoxication. During the conference to settle the jury instructions, the court invited comment on the modified version of CALCRIM No. 3426 it proposed to give.  No defendant raised any objection to, or sought any modification of, CALCRIM No. 3426.  "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024; accord, *People v. Sanders* (1995) 11 Cal.4th 475, 533.)  The claim of error has therefore been forfeited and requires no further discussion.

### b.    Special instruction No. 2

Defendant Mejia argues that special instruction No. 2 regarding count 5 (kidnapping for robbery) was a prejudicially inaccurate statement of law.  Defendants Limon and Barnes join without additional argument.  Respondent argues the point has been forfeited by failure to object below, and that, in any event, the instruction is a correct statement of law.

29

The challenged instruction reads: "Where the kidnapping occurs after the actual perpetration of the robbery, such kidnapping may be kidnapping for the purpose of robbery if it may reasonably be inferred that the transportation of the victim was to effect the escape of the robber or to remove the victim to another place where he or she might less easily sound alarm." Mejia concedes no objection was raised in the trial court to this instruction, but contends the claim of error is still properly resolved because the instruction impacted her substantial rights. (§ 1259.) We briefly address the merits. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1315, fn. 43.)

The special instruction is essentially a quotation from *People v. Monk* (1961) 56 Cal.2d 288 (*Monk*), a case Mejia contends was disapproved in *People v. Laursen* (1972) 8 Cal.3d 192 (*Laursen*). Mejia further argues that even assuming the instruction was a correct statement of law, the language used impermissibly diluted the prosecution's burden of proof and the law regarding circumstantial evidence.

In *Laursen*, the Supreme Court stated: "This court has consistently recognized that '[robbery] . . . is not confined to a fixed *locus*, but is frequently spread over a considerable distance and varying periods of time.' [Citations.] The assault of the victim, the seizure of his property *and the robber's escape to a location of temporary safety are all phases in the commission of the crime of robbery* linked not only by a proximity of time and distance, but a singlemindedness of the culprit's purpose as well. Accordingly, we conclude that when as in the instant case the finder of fact may have reasonably inferred and accordingly have found that *the kidnaping of an individual was to effect a robber's escape such kidnaping is proscribed by the provisions of section 209*." (*Laursen*, *supra*, 8 Cal.3d at pp. 199-200, italics added.)

*Laursen* did not overrule *Monk*. The court merely stated that to the extent any inferences from the language in *Monk* were inconsistent with the holding in *Laursen*, *Monk* was disapproved. (*Laursen*, *supra*, 8 Cal.3d at p. 200, fn. 6.) The language used in the special instruction taken almost verbatim from *Monk* was not inconsistent with *Laursen*. Nor do we find it had any tendency to misdirect or mislead the jury from proper consideration of the remaining instructions regarding the burden of proof, circumstantial evidence or the required elements of count 5, including CALCRIM Nos. 220, 225, 1203,

30

and 1600-1603.  Special instruction No. 2, when read in conjunction with the instructions as whole, simply informed the jury of a well-established principle of law, namely that a violation of section 209 may occur where a robbery victim is kidnapped after the taking of property by force or fear, but while the robbery is still ongoing and the kidnapping is undertaken to facilitate the robber's escape from the scene.

### c. Lesser included offenses

Defendant Mejia contends the court failed to instruct sua sponte on the lesser included offenses of conspiracy to commit murder and robbery.  Specifically, Mejia argues the court was required to instruct on:  (1) conspiracy to commit voluntary manslaughter due to intoxication; (2) conspiracy to commit manslaughter due to imperfect self-defense or defense of others; and (3) conspiracy to commit assault with a deadly weapon.  Defendant Alcorn joins and adds that (4) conspiracy to commit assault with force likely to produce great bodily injury, and (5) conspiracy to commit battery were also lesser included offenses on which instructions should have been given.  Defendants Limon and Barnes join without additional argument.

We begin with the well-established proposition that the court's obligation to instruct on all principles of law relevant to the issues raised by the evidence at trial includes the obligation to instruct " 'on any lesser offense "necessarily included" in the charged offense, *if there is substantial evidence that only the lesser crime was committed*.  This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence.'  [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239, italics added.)

However, no duty to instruct arises unless there is substantial evidence to support a jury finding on the lesser offense.  "An instruction on a lesser included offense *must be given only when the evidence warrants such an instruction*.  [Citation.]  To warrant such an instruction, there must be substantial evidence of the lesser included offense, that is, 'evidence from which a rational trier of fact could find beyond a reasonable doubt' that the defendant committed the lesser offense.  [Citation.]  Speculation is insufficient to require the giving of an instruction on a lesser included offense.  [Citations.]  In addition,

31

a lesser included instruction need not be given when there is no evidence that the offense is less than that charged." (*People v. Mendoza* (2000) 24 Cal.4th 130, 174, italics added.)

The court did not err in declining to instruct on conspiracy to commit voluntary manslaughter in light of *People v. Cortez* (1998) 18 Cal.4th 1223 (*Cortez*). *Cortez* reaffirmed the principle, enunciated in *People v. Swain* (1996) 12 Cal.4th 593, that "the crime of conspiracy to commit murder requires a finding of unlawful intent to kill, i.e., express malice, and that such offense cannot be committed if the underlying criminal objective is second degree *implied malice* murder." (*Cortez,* at p. 1226.) The Supreme Court explained that "it logically follows that where two or more persons conspire to commit murder--i.e., intend to agree or conspire, further intend to commit the target offense of murder, and perform one or more overt acts in furtherance of the planned murder--each has acted with a state of mind 'functionally indistinguishable from the mental state of premeditating the target offense of murder.' [Citation.] The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder--hence all murder conspiracies are conspiracies to commit first degree murder." (*Cortez,* at p. 1232.)

Mejia makes the insupportable argument that *Cortez* only held there is no such crime as conspiracy to commit second degree murder, but did not address whether there may be a crime of conspiracy to commit voluntary manslaughter. The analysis and logic of *Cortez* is premised on the principle that conspiracy to commit murder is a specific intent crime, requiring the specific intent to agree in advance to commit a murder. The crime cannot be proven with implied malice, and it cannot be proven by showing a defendant's inability to form intent due to intoxication or an agreement to act under a group delusion of the need to defend oneself or another. *Cortez* states over and again, as plainly as possible, that conspiracy to commit murder can only be murder of the first degree. (*Cortez*, *supra*, 18 Cal.4th at pp. 1232, 1237-1238.)

We also find there was no error in declining instructions on conspiracy to commit assault with force likely to produce great bodily injury, conspiracy to commit assault with a deadly weapon or conspiracy to commit battery. For the sake of argument, assuming such offenses are lesser included offenses of the conspiracy to commit murder and

32

robbery count as pled in count 1, there was no substantial, credible evidence of a conspiracy to merely assault or batter the victim. The evidence supported the charged counts but not these lesser charges, so the court did not err by refusing to instruct on the lesser offenses. (*People v. Mendoza*, *supra*, 24 Cal.4th at p. 174.)

All of the evidence in the record pointed to a conspiracy to silence a perceived snitch. There was no credible evidence the conspiracy was only to physically threaten and intimidate Brown to dissuade her from being a witness to the earlier incident at the motel. The verbal threat by Mejia was that she was going to kill Brown for talking. Brown was stabbed with knives and hit in the head with a bat or cane. The injuries Brown sustained did not take her life, but that does not mean there was substantial evidence of an agreement to only assault or batter her. Brown was bound and gagged twice with duct tape, carried and placed into a truck bed where her body was covered before being driven from the scene—evidence wholly at odds with an agreement to simply intimidate a perceived snitch. None of the evidence offered by the three defendants who testified supported a theory of a conspiracy to merely assault or batter Brown. The jury could believe the prosecution's case, or not, but no reasonable jury could reject the evidence of a conspiracy to commit murder and find defendants only conspired to commit an assault or battery.

### d.     Instruction regarding one or multiple conspiracies

Defendant Limon contends the trial court had a sua sponte duty to instruct the jury to determine whether defendants entered into one or multiple conspiracies. Defendants Mejia, Barnes and Alcorn join without additional argument.

Defendant Limon argues the court should have sua sponte instructed with CALJIC No. 17.05. However, by its own language, CALJIC No. 17.05 applies only when there are two or more *counts* of conspiracy charged against a defendant. Defendants were charged with only one count of conspiracy and, as even Limon admits in her briefing, all of the evidence pointed to one overall conspiracy with one singular objective, namely to silence a perceived snitch. " 'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all

33

directed to achieving a single unlawful end or result." ' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1672 (*Meneses*).)

A trial court has "a sua sponte duty to instruct the jury to determine if single or multiple conspiracies exist *where the evidence supports alternative findings*." (*Meneses*, *supra,* 165 Cal.App.4th at p. 1668, italics added.) Where the evidence does not support alternative findings, no instructional error occurs. (*Ibid*.)

### e. The unanimity instruction

Defendant Limon argues the court erred in failing to give a unanimity instruction on count 1. Limon contends that because the conspiracy count was presented and argued by the prosecution as being a conspiracy to murder, to rob, or to murder and rob, the jury had to be instructed it must unanimously agree on the target crime or crimes. Defendants Mejia, Barnes and Alcorn join without additional argument.

The purpose behind the unanimity instruction is " 'to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) Defendant Limon urges that CALJIC No. 17.01 would have been the appropriate instruction.

Limon's argument ignores the instruction that *was* given, CALCRIM No. 415, which *unequivocally* instructed the jury it was required to agree unanimously on the target crime or crimes of the conspiracy charged in count 1. The relevant portion of the instruction reads: "The People allege that the defendant conspired to commit the following crimes: Robbery and/or Murder. You may not find a defendant guilty of conspiracy unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime he or she conspired to commit. You must also agree on the degree of the crime."

34

The Bench Notes to CALCRIM No. 415, citing *Russo*, explain that the unanimity instruction is required where the evidence suggests two discreet conspiracies, and also where, as here, "multiple crimes are alleged as target offenses" of one conspiracy. (Bench Notes to CALCRIM No. 415 (2014), p. 173.)  The trial court instructed with the appropriate bracketed language from CALCRIM No. 415, quoted above, in addition to providing the jury, as so indicated in the Bench Notes, with verdict forms on which it could indicate the "specific crime or crimes that [it] unanimously agree[d] the defendant conspired to commit." (*Ibid.*)  The instructions and verdict forms properly addressed the issue and no error has been shown.

### f.      CALCRIM No. 220

Defendant Durden argues the court prejudicially erred in instructing his jury on the issue of burden of proof.  Specifically, Durden contends CALCRIM No. 220 was incomplete and misleading because it failed to instruct the jury the prosecution bore the burden to prove "each element" of each charge beyond a reasonable doubt.  Durden acknowledges this argument was rejected in *People v. Ramos* (2008) 163 Cal.App.4th 1082 (*Ramos*), but articulates his disagreement with *Ramos* to preserve further appellate review of the issue.

We are not persuaded to depart from *Ramos*.  (See also *People v. Aranda* (2012) 55 Cal.4th 342, 353 ["A court satisfies its statutory obligation to instruct" on the principles of burden of proof and presumption of innocence "by giving CALJIC No. 2.90 or CALCRIM No. 220"].)  The jury was thoroughly informed as to the relevant law regarding the burden of proof.

### 3.      The Evidentiary Ruling Regarding Durden's Pretrial Statement

Defendant Durden contends the court prejudicially erred by refusing his request, pursuant to Evidence Code section 356, to admit the entirety of his recorded pretrial statement to police officers.

A trial court is vested with broad discretion in determining the admissibility of evidence.  (*People v. Lewis* (2001) 26 Cal.4th 334, 374-375.)  We review any such ruling under the deferential abuse of discretion standard.  (*People v. Rowland* (1992) 4 Cal.4th 238, 264.)

35

Evidence Code section 356 provides that "[w]here part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

Evidence Code section 356 "permits the introduction of statements that are necessary for the understanding of, or to give context to, statements already introduced." (*People v. Lewis* (2008) 43 Cal.4th 415, 458, overruled on other grounds as stated in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) "The purpose of Evidence Code section 356 is to avoid creating a misleading impression." (*People v. Samuels* (2005) 36 Cal.4th 96, 130 [rejecting the defense argument it was error to refuse request to introduce complete interview where entire interview covered areas not at issue in portion offered by the prosecution].)

The substance of the seven omitted pages of Durden's statement (pages 15 through 21) may be summarized as follows: Detective Schaap's explanation of possible charges; Durden's elaboration on Mejia's and Limon's purported obsession with their knives; Durden's fear of Mejia, Limon, and Alcorn as the incident unfolded; Durden's concern Alcorn may have mistakenly believed Durden was involved with Alcorn's ex-girlfriend; and Durden's assertion he had no idea what was planned.

The only statements from the omitted portion of Durden's statement that are relevant to the admitted portion pertain to his more colorful descriptions of Mejia's and Limon's obsession with their knives ("kissing" and "caressing" the knives), Durden's fear of the situation and of Alcorn because he was concerned Alcorn may have thought he was seeing Alcorn's ex-girlfriend, and his claimed lack of knowledge of what was going on. However, the admitted portion of the statement contained these same thoughts and concerns by Durden. The court was reasonably justified in concluding the additional statements were merely repetitive, and did not add to or provide necessary context for the admitted portion of the statement.

Moreover, the redacted version of Durden's statement did not distort, materially or otherwise, the nature of Durden's role in the crimes or present a misleading impression of his statement about what occurred. Durden has not shown the court's evidentiary ruling under Evidence Code section 356 constituted an abuse of discretion.

## 4. The Sentencing Arguments

All five defendants raise challenges to their respective sentences. We conclude the sentences were lawfully imposed, except for error pursuant to section 654 affecting all five defendants.

### a. Section 654 error

Defendants Mejia, Limon and Alcorn argue the court committed error pursuant to section 654. Mejia and Limon argue their respective sentences on counts 3 (robbery) and 5 (kidnapping for robbery) must be stayed as the crimes were committed as one indivisible course of conduct embraced by the conspiracy. Alcorn raises essentially the same argument contending his sentences on count 2 (attempted murder), count 3 (robbery), and count 5 (simple kidnapping) must be stayed. Barnes and Durden joined without additional argument.

Penal Code section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 was "intended to ensure that [a] defendant is punished 'commensurate with his culpability' [citation]." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

The conspiracy statute provides that where, as here, there is one overall conspiracy found by the jury, but it included multiple target crimes, only one sentence is imposed and the court is to choose the penalty prescribed for the target offense that provides the greatest maximum term. "If the felony is conspiracy to commit two or more felonies which have different punishments and the commission of those felonies constitute but one offense of conspiracy, the penalty shall be that prescribed for the felony which has the greater maximum term." (§ 182.)

37

Because the red jury found one conspiracy to commit murder and robbery, the sentence on count 1 for Mejia, Limon, Barnes and Alcorn should have been fixed based on the penalty for murder which carries a greater penalty than robbery. For Durden, his conspiracy count was found by the blue jury to be only conspiracy to commit robbery so his sentence must be based on robbery (plus his status as a third-strike offender).

In *People v. Lewis*, *supra*, the defendant was charged with multiple felonies, including one count of conspiracy to commit the crimes of murder, robbery, kidnapping for robbery, kidnapping and receiving stolen property. The jury found defendant guilty on the conspiracy count "as charged." Despite the sole conspiracy count, the trial court imposed five separate conspiracy sentences pertaining to each of the five target offenses identified in the indictment. The Attorney General conceded the sentencing error and the Supreme Court concurred, holding that only one sentence on the conspiracy count was authorized. The court further explained that, because of section 654, *the defendant could "not be punished for both the underlying crimes and the conspiracy, because there was no showing that the object of the conspiracy was any broader than commission of the underlying crimes*." (*People v. Lewis*, *supra*, 43 Cal.4th at p. 539, italics added.)

Here, defendants were charged with only one conspiracy count alleging a single agreement to murder and rob Brown. Evidence was presented as to a single agreement to commit both offenses. The jury found, and specified in the verdict forms, that Mejia, Limon, Barnes and Alcorn formed a single conspiracy to commit two crimes, both murder and robbery. Durden's jury found he only joined in the agreement to commit robbery. However, the trial court imposed *two sentences on count 1* on Mejia, Limon, Barnes and Alcorn, one for conspiracy to commit murder and another for conspiracy to commit robbery, imposing a stay pursuant to section 654 as to the latter.

Respondent argues the stay on the "conspiracy to commit robbery" portion of the sentence on count 1 justifies the imposition of sentence for robbery in count 3. We disagree. We find section 182 requires imposition of only one sentence on count 1, and *People v. Lewis*, *supra*, 43 Cal.4th 415 requires a stay of sentence on count 3. Accordingly, we strike the sentences imposed on Mejia, Limon, Barnes and Alcorn for a

conspiracy to commit robbery in count 1, and we order a section 654 stay on the sentences on count 3 (robbery) for all five defendants.

Alcorn contends the imposition of sentences on counts 2, 3 and 5 violated section 654. Barnes and Durden join in this contention. We have already found the defendants' sentences on count 3 should be stayed. Alcorn was the only defendant convicted of attempted murder in count 2. Respondent concedes the court should have stayed Alcorn's sentence for attempted murder on count 2, since it was the substantive offense for which Alcorn was sentenced under count 1 for conspiracy to murder. Accordingly, we order a stay of the sentence imposed on Alcorn for attempted murder on count 2.

We reject respondent's argument the count 5 kidnapping sentences need not be stayed. Respondent argues the kidnapping was not merely incidental to the overall objective of the conspiracy to commit robbery and murder because those crimes could have been committed at Barnes's house; instead, Alcorn bound and gagged Brown and transported her in his pickup truck in order to torture and abuse her on Mount Baldy. Presumably, respondent's theory is that Barnes and Durden aided and abetted the separately motivated kidnapping. Respondent offers no explanation for the theory that Mejia and Limon had a motive for the kidnapping separate from the robbery.

We find respondent's argument as to the separate intent of Alcorn is based on speculation of a separate motive to torture Brown once defendants got her up into the hills before they dumped her body. Respondent cites only one case to support this argument, *People v. Nguyen* (1988) 204 Cal.App.3d 181. That case discussed the propriety of the appellate court deferring to the trial court's implied finding of divisibility of motive with respect to the gratuitous shooting of a robbery victim by one accomplice to a robbery. That case is not particularly helpful to us here, because there is no substantial evidence that any defendant harbored an intent to kidnap Brown for any reason other than to effectuate the robbery and attempted murder. (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507 [where multiple offenses are part of one indivisible course of conduct and " 'incident to one objective, the defendant may be punished for any one of

such offenses but not for more than one' "].)  Accordingly, we order a section 654 stay of the sentences on count 5 for all five defendants.

> **b.**  **Defendant Barnes's Eighth Amendment claim**

Barnes contends his sentence consisting of a 25-year-to-life indeterminate term, plus a determinate term of 7 years 8 months is grossly disproportionate to his limited role in the crimes, and therefore amounts to cruel and unusual punishment in violation of the Eighth Amendment.  Respondent argues any objection on this basis was forfeited by Barnes's failure to object to the sentence in the trial court on those grounds.  Barnes urges us to resolve the merits "in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim." (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.) We briefly discuss the merits.

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'  [Citation.]" (*Ewing v. California* (2003) 538 U.S. 11, 20 [affirming sentence of 25 years to life imposed on a third-strike offender convicted of felony grand theft for the theft of $1,200 worth of merchandise].)  The Eighth Amendment prohibits only a sentence that is "grossly disproportionate" to the severity of the charged crime(s).  (*Ewing,* at p. 21.) Outside the context of a capital sentence, " 'successful challenges to the proportionality of particular sentences have been exceedingly rare.'  [Citation.]" (*Ibid*.)

"A sentence violates the state prohibition against cruel and unusual punishment (Cal. Const., art. I, §§ 6, 17) if ' "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience." '  [Citations.]  [¶]  A sentence violates the federal Constitution [(U.S. Const., 8th & 14th Amends.)] if it is 'grossly disproportionate' to the severity of the crime." (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.)

Given the substantial evidence already discussed at length in part 1 above which supports Barnes's conviction as a coconspirator in an agreement to murder and rob Brown, we find no basis to conclude that his sentence shocks the conscience or is grossly disproportionate to the severity of the crimes and Barnes's role in them.  Barnes's assertion he played a de minimus role is based solely on his own self-serving testimony which was not credited by the jury.

### c. Imposition of upper terms and consecutive sentencing

Defendant Durden contends the court erred in failing to state its reasons for imposing upper terms and consecutive sentences in violation of section 1170, subdivision (c). Durden requests remand for resentencing. Respondent contends Durden forfeited any such claim of error by failing to object at the time of sentencing. Durden does not contest respondent's claim he failed to preserve his claim, but urges this court to exercise its discretion to consider the issue despite the forfeiture. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [reviewing court is vested with discretion to consider issues not preserved below by appellant].) We conclude the claim of error was forfeited. (*People v. Scott* (1994) 9 Cal.4th 331, 355-356.)

In any event, the record does not support Durden's claim of error. The court articulated numerous aggravating factors it considered relevant to its sentencing choices, including that the crimes of which Durden was convicted involved great violence, a particularly vulnerable victim, Durden armed himself with a deadly weapon, there was evidence of planning and the nature of the crimes showed premeditation, Durden had multiple prior convictions and strikes, and Durden had engaged in a pattern of violent conduct and crimes over a considerable period of time. A single aggravating factor is sufficient to warrant imposition of an upper term or a consecutive sentence. (*People v. Osband* (1996) 13 Cal.4th 622, 728-729.)

## DISPOSITION

The sentence of defendant and appellant Crystal Mejia is modified as follows: The 12-year determinate term for conspiracy to commit robbery imposed and stayed on count 1 (conspiracy to commit murder and robbery) is vacated; the sentence on count 3 (robbery) and the sentence on count 5 (kidnapping for robbery) are stayed pursuant to Penal Code section 654. The judgment as to Crystal Mejia is affirmed in all other respects.

The sentence of defendant and appellant Gloria Limon is modified as follows: The six-year determinate term for conspiracy to commit robbery imposed and stayed on count 1 (conspiracy to commit murder and robbery) is vacated; the sentence on count 3 (robbery) and the sentence on count 5 (kidnapping for robbery) are stayed pursuant to

41

Penal Code section 654.  The judgment as to Gloria Limon is affirmed in all other respects.

The sentence of defendant and appellant Barry Barnes is modified as follows:  The four-year determinate term for conspiracy to commit robbery imposed and stayed on count 1 (conspiracy to commit murder and robbery) is vacated; the sentence on count 3 (robbery) and the sentence on count 5 (kidnapping) are stayed pursuant to Penal Code section 654.  The judgment as to Barry Barnes is affirmed in all other respects.

The sentence of defendant and appellant Todd Alcorn is modified as follows:  The six-year determinate term for conspiracy to commit robbery imposed and stayed on count 1 (conspiracy to commit murder and robbery) is vacated; the sentence on count 2 (attempted murder), the sentence on count 3 (robbery) and the sentence on count 5 (kidnapping) are stayed pursuant to Penal Code section 654.  The judgment as to Todd Alcorn is affirmed in all other respects.

The sentence of defendant and appellant Victor Durden is modified as follows: The concurrent 33-year-to-life term, plus the 24-year determinate term, on count 3 (robbery), and the consecutive 31-year-to-life term, plus the 20-year determinate term, on count 5 (kidnapping for robbery) are stayed pursuant to Penal Code section 654.  The judgment as to Victor Durden is affirmed in all other respects.

The superior court is directed to prepare modified abstracts of judgment as to Crystal Mejia, Gloria Limon, Barry Barnes, Todd Alcorn and Victor Durden in accordance with this opinion and transmit same to the Department of Corrections and Rehabilitation forthwith.

GRIMES, J.

We concur:

BIGELOW, P. J.

RUBIN, J.

42